**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION**

|  |  |
|---|---|
| DAMON CRIST, | **MEMORANDUM DECISION AND ORDER** |
| Plaintiff, | |
| v. | Case No. 2:10-CV-675-TS |
| KENNON TUBBS, MD, et al., | District Judge Ted Stewart |
| Defendants. | |

Plaintiff, Damon Crist, an inmate at the Utah State Prison, filed this *pro se* civil rights

suit under 42 U.S.C. § 1983.  Plaintiff was allowed to proceed *in forma pauperis* under 28 U.S.C.

§ 1915.  Before the court is Defendants' Motion for Summary Judgment (Doc. no. 84).

**ANALYSIS**

**I.  Introduction**

Plaintiff's Second Amended Complaint (Doc. nos. 8 and 57) asserts ten causes of action

including violations of Plaintiff's rights under the United States Constitution, the Utah

Constitution and Utah state laws.  Plaintiff alleges two primary claims under the U.S.

Constitution:  (1) cruel and unusual punishment under the Eighth Amendment based on denial of

medication for chronic back pain; and, (2) violation of Plaintiff's First Amendment rights based

on retaliation for his filing of numerous grievances against various prison officials.[1]  Plaintiff

_____

[1]  Plaintiff also asserted a claim (Count I) for denial of due process under the Fifth and
Fourteenth Amendments based on allegedly improper handling of his grievances.  In his
opposition memorandum, however, Plaintiff concedes this claim and states that Billie Casper, the

seeks injunctive relief, compensatory and punitive damages, attorney fees, court costs and any

additional relief the Court deems proper.

On September 22, 2011, Defendants filed a *Martinez* Report (Doc. nos. 70-78) addressing

Plaintiff's allegations.[2]   Based on the evidence presented in the *Martinez* Report, Defendants

now move for summary judgment on each of Plaintiff's claims.   Defendants contend that

Plaintiff's medical claims merely show disagreement regarding the proper treatment for

Plaintiff's condition and that the evidence does not show Defendants were deliberately

indifferent to Plaintiff's serious medical needs.   Moreover, Defendants contend that the

discontinuation of certain medications for Plaintiff was not retaliatory but was based on

legitimate concerns about abuse and, therefore, was not unconstitutional.   Finally, Defendants

assert that even if Plaintiff could show a constitutional violation Defendants are entitled to

qualified immunity because the rights at issue were not clearly established at the time of the

allegedly unlawful acts.

## II.  Summary Judgement Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  "One of the principal purposes of the summary judgment rule is to isolate and dispose of

---

prison Grievance Coordinator, "should be released from this lawsuit."  (Doc. no. 94 at 1.)

[2] In *Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978), the Tenth Circuit approved the
practice of district courts ordering prison administrators to prepare a report to be included with
the pleadings in cases where a prisoner alleges a constitutional violation by prison officials.

factually unsupported claims or defenses," *Cellotex v. Catrett*, 477 U.S. 317, 324, 106 S. Ct.

2548, 2553 (1986), thus; "[a] party may move for summary judgment, identifying each claim or

defense–or the part of each claim or defense–on which summary judgment is sought."  Fed. R.

Civ. P. 56(a).

 The party moving for summary judgment bears the initial burden of showing "that there is

an absence of evidence to support the non-moving party's case."  *Cellotex*, 477 U.S. at 325.  This

burden may be met merely by identifying portions of the record which show an absence of

evidence to support an essential element of the opposing party's case.  *Johnson v. City of

Bountiful*, 996 F. Supp 1100, 1102 (D. Utah 1998).   Once the moving party satisfies its initial

burden "the burden then shifts to the nonmoving party to make a showing sufficient to establish

that there is a genuine issue of material fact regarding the existence of [the disputed] element."

*Id.*  A fact in dispute is "material" only if it might affect the outcome of the suit under governing

law.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).  The dispute is "genuine" if the

evidence is such that it might lead a reasonable jury to return a verdict for the non-moving party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

 A nonmovant "that would bear the burden of persuasion at trial" must "go beyond the

pleadings and 'set forth specific facts' that would be admissible in evidence in the event of a trial

from which a rational trier of fact could find for the nonmovant."  *Adler v. Wal-Mart Stores*, 144

F.3d 664, 671 (10th Cir. 1998).  Mere allegations and references to the pleadings will not suffice;

instead, the specific facts put forth by the nonmovant "must be identified by reference to an

affidavit, a deposition transcript or a specific exhibit incorporated therein."  *Thomas v. Wichita*

3

*Coca-Cola Bottling*, 968 F.2d 1022, 1024 (10th Cir. 1992).  Moreover, "the nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient."  *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir .1991).  The court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing the motion."  *Lopez v. LeMaster*, 172 F.3d 756, 759 (10th Cir. 1999).  Conclusory allegations are given no weight, and "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient" to overcome a summary judgment motion.  *Anderson*, 477 U.S. at 249, 252.

### III.   Material Facts[3]

1.       Plaintiff, Damon Crist, is an inmate at the Utah State Prison in Draper, Utah. (Pl.'s Second Am. Compl. (Doc. nos. 8 and 57) at ¶¶ 1, 11).  Plaintiff is incarcerated for, among other things, theft, burglary, and kidnaping.  (Crist Presentence Investigation Reports ("PSIRs"), Ex. A-E to Second Zeller Decl., sealed at 1.)  Plaintiff's abuse of narcotics contributed significantly to his crimes.  Plaintiff became addicted to methamphetamine around the age of 18. (Crist PSIR I at 3.)  Plaintiff tested positive for methamphetamine while on supervision.   (Crist PSIR II at 3.)  Plaintiff acknowledged that he was "heavily addicted to meth," (Crist PSIR Addendum at 3) and "all of his criminal offenses were directly influenced either by alcohol or

---

[3]  The facts presented here are drawn from the parties' preliminary injunction and summary judgment briefs and accompanying exhibits, as well as the *Martinez* Report and Plaintiff's response thereto.  The facts are construed in the light most favorable to Plaintiff, the non-moving party.  Except as noted herein, these facts are undisputed.

drug abuse." (Crist PSIR I at 9).  As part of his sentence, Plaintiff was enrolled in the Conquest

program for narcotics addiction and treatment.  (Tubbs Decl. ¶ 14.)

      2.      Defendant Kennon Tubbs is a licensed physician, board certified by the American

Academy of Family Physicians, who is employed as a part-time physician at the Utah State

Prison in Draper, Utah.  (Tubbs Decl. ¶¶ 3–4.)  Dr. Tubbs has treated Plaintiff many times.  (*Id.*

at ¶ 5.)

      3.      Defendants Wesley Shuman and Ford Fannen are Medical Technicians, or "Med-

Techs" at the Utah State Prison.  (Shuman Decl. ¶ 3; Fannen Decl. ¶ 3.)  Defendant Christopher

Best was a med-tech at the prison in 2008 and 2009.  (Best Decl. ¶¶ 4–5.)

      4.      Defendant James Olin is a Sergeant at the Utah State Prison who has overseen

housing units where Plaintiff lived.  (Olin Decl. ¶¶ 2–4.)

      5.      Defendant William Morell is a Sergeant at the Utah State Prison who has

overseen housing units where Plaintiff lived.  (Morell Decl. ¶ 3, 7.)

***Plaintiff's Reported Back Injury***

      6.      Plaintiff states that he injured his back lifting large stacks of chairs on July 5,

2008.  (Crist Aff. ¶ 1.)  Plaintiff states that he submitted his first Inmate Care Request, or ICR,

regarding this injury that same day, although there is no record of it.  (Crist Aff. ¶ 2.)  After not

receiving a prompt response to his first ICR, Plaintiff reportedly submitted a second ICR

regarding this injury on July 12, 2008.  (Crist Aff. ¶ 3.)

      7.      Defendants admit receiving an ICR from Plaintiff complaining of back pain and

requesting  to see a physician on July 15, 2008.  (Crist M-Track 000431–32.)  However, there are

no prison records showing any complaints from Plaintiff regarding back pain prior to that time, and none of the med-techs who helped dispense medication, or worked the "pill-line," had any knowledge of Plaintiff experiencing any back pain before that time.  (*E.g.*, Fannen Decl. ¶ 7; Best Decl. ¶¶ 6–9.)  Sgt. Morell states that he visited Plaintiff's dormitory numerous times between July 1 and July 18, 2008, and Plaintiff did not appear to be in pain nor did he report any injuries to Sgt. Morell.  (Morell Decl. ¶¶ 6–14.)

8.      Plaintiff states that on July 17, 2008, he spoke to Defendant Fannen at the pill-line about his injury and the pain he was experiencing and Fannen told him to return to the pill-line the following morning when a med-tech would be able to help him.  (Crist Aff. ¶ 4.)

9.      On July 18, 2008, Plaintiff attended the pill-line manned by Med-Tech Shuman and requested medication and a physician visit.  (Am. Compl. ¶ 15; Shuman Decl. ¶¶ 6–7).  Unless there is an emergency situation med-techs do not make medical appointments, instead, prison policy requires that an inmate must submit an ICR and wait to be scheduled to see a physician.  (Shuman Decl. ¶¶ 8–9; Fannen Decl. ¶ 8–10.)  Shuman refused to contact a doctor immediately and instructed Plaintiff to file another ICR.  (Crist Aff. ¶ 5.)  Plaintiff then threatened to sue Shuman if he did not provide immediate help.  Shuman considered Plaintiff to be acting belligerent and requested that Sgt. Olin intervene.  (Am. Compl. ¶ 16; Shuman ¶¶ 10–11; Olin Decl. ¶¶ 9–13.)

10.     Sgt. Olin informed Plaintiff that he was being disorderly, ordered him off of the pill-line, and documented Plaintiff's behavior with a negative "Chronological Note" (C-note), the least serious management tool available.  (Olin Decl. ¶ 15.)

6

11.    Plaintiff continued trying to expedite his medical care over the next several days. (Crist Aff. ¶¶ 6-7.)

*Plaintiff's Treatment*

12.    On July 23, 2008, Plaintiff was seen by the prison medical staff and was diagnosed with muscle spasms; a diagnosis which Plaintiff asserts was incorrect.  The provider observed that Plaintiff appeared to have a lumbar muscle strain and recommended NSAIDs, muscle relaxants, and ice.  Plaintiff was also instructed in proper lifting technique and directed to follow up as needed with the medical clinic.  (Crist M-Track 000430-000431.)

13.    In the following months, Plaintiff was regularly seen by Dr. Tubbs and other prison medical staff.  A physician's assistant (P.A.) prescribed Tramadol HCL 50 mg, also known as Ultram, for Plaintiff in August 2008.  (Crist M-Track 000419.)  Ultram is used to treat moderate chronic pain and is an opioid that can be abused or cause dependence.  (Crist M-Track 000391-000392.)  Plaintiff also received physical therapy (Crist M-Track 000409), X-rays (Crist M-Track 000419), multiple MRI scans (Crist M-Track 000370–71, 000353; Crist Hard Chart 000056), an EMG scan (Crist M-Track 000271), and pain medication (Crist M-Track 000419).

14.    On September 17, 2008, Dr. Tubbs noted in M-Track that Plaintiff was requesting to have his dose of Ultram returned to the higher level of 100mg and wanted permission to take the medication back to his cell.  (Crist M-Track 000385.)

15.    On September 30, 2008, Plaintiff requested a medical visit with Dr. Roberts or Dr. Tubbs to inquire about receiving evening pain medication.   (Crist M-Track 000380.)

16.     On October 3, 2008, Plaintiff complained of increased pain and was referred for a visit with Dr. Tubbs.   (Crist M-Track 000375.)

17.     On October 10, 2008, Plaintiff was examined by Dr. Tubbs who noted normal range of motion and no improvement after being on Ultram for past three months.  Tubbs also noted that Plaintiff had a history of drug abuse but claimed not to be "drug seeking."  Although Tubbs determined that Plaintiff's symptoms warranted an MRI, he noted that Plaintiff was "pushing very aggressively for more pain control but I will not give ultram tid without documented evidence of real disease on MRI."   (Crist M-Track 000371-72.)

18.     Plaintiff underwent an L-spine MRI on November 18, 2008, which Dr. Tubbs noted showed "moderate bilateral facet osteoarthritis and circumferential disc bulge eccentric to the left at L5/S1, resulting in mild encroachment on the left lateral recess."  (Crist M-Track 000353.)  Tubbs continued Plaintiff's Ultram based on these findings.

19.     On December 10, 2009, P.A. Merrill renewed Plaintiff's Ultram prescription for six months.  Merrill noted that Plaintiff continued to complain of back pain, especially when sleeping, and had significant findings on his MRI.  (Crist M-Track 000347.)

20.     On January 13, 2009, Plaintiff was offered a surgical option to address his back pain but elected not to have the surgery.  (Crist M-Track 000328.)

21.     On February 17, 2009, Plaintiff attended a scheduled medical appointment with Dr. Tubbs who noted that Plaintiff was already on Ultram but was seeking additional medication for lumbar pain.  Dr. Tubbs reviewed the MRI findings with Plaintiff from November 18, 2008, which showed no new trauma or recent injury.  Dr. Tubbs noted that he would send Plaintiff to

8

neurosurgery for consideration of nerve root injections.  (Doc. no. 64, Ex. J.)  Based on a

physical exam and Plaintiff's ongoing complaints of pain, Dr. Tubbs also referred Plaintiff for

further testing at the University of Utah Medical Center.  (Crist Aff. ¶ 17.)

     22.     On February 20, 2009, Plaintiff had another interaction with Dr. Tubbs.  Plaintiff

states that he was not scheduled for a medical exam on that day but came to the clinic to ask Dr.

Tubbs the names of several med-techs whom Plaintiff intended to sue regarding his medical care.

(Crist Aff. ¶ 17.)  Plaintiff states that when Dr. Tubbs discovered Plaintiff's intention he tried to

dissuade Plaintiff from filing a lawsuit, arguing that Plaintiff had received adequate medical care.

(*Id*.)  Dr. Tubbs then pulled up and reviewed Plaintiff's medical records on the computer and

noted the number of times Plaintiff had been seen by medical staff.  (*Id*.)  After further discussion

with Plaintiff and further review of Plaintiff's medical records Dr. Tubbs determined that

Plaintiff was exhibiting drug-seeking behavior and stated that he was discontinuing Plaintiff's

Ultram on that basis.  (*Id*.)  Plaintiff then accused Dr. Tubbs of retaliation, which Tubbs denied,

and Plaintiff left the office.  (*Id*.)

     23.     Dr. Tubbs made the following entries in the M-Track system regarding the

February 20, 2009, encounter:

> Type: MD SICK CALL
> Start: 02/20/2009 14:56
> End: 02/20/2009 14:56
> Desc.: pt seen today for eval of back.  He is complaining of severe
> back pain and demanding his ultram be increased.  I reviewed with
> him today his lumbar xrays and lumbar MRI dated 11/08.  It showed
> mild disc disease without neuroforamenal stenosis or impingement.
> He has been on ultram for 10 months and I informed him that I was
> concerned that he was becoming addicted to this medication.  He has

built up a tolerance to the medication which is requireing [sic] him to
request more medication because the current dose is not working.  He
stated today that "I know guys in here who take ultram 4 times a day"
He also reported the [sic] he was sick of being treated like a drug
addict by the medical staff.

I have decided that he should discontinue the ultram at this time.  He
is becoming dependent on this medication and is showing drug
seeking behavior.    When I informed him that I would be
discontinueing [sic] his medication he threatened me with a lawsuit.
He then stated that if Ultram was so bad why has he been on it for 10
months.  He has seen no improvement in his back pain over the last
10 months.  His objective findings aer [sic] very minimal and non
surgical in nature.  I am concerned that he has become dependent on
the medication and should stop it before worsening his addiction.

Type: MD SICK CALL
Start: 02/20/2009 15:00
End: 02/20/2009 15:00
Desc.:  i reviewed OTRACK record and according to otrack He has
a hx of drug addiction though he does not have any current charges
for drug issues.  He has used ETOH 1/1/05 daily, Methamphetamine
daily 1/1/05 and marijuana daily 1/1/03.  I confronted the inmate on
his drug use and he became very defensive.  This is a contraindication
for Ultram use and this is another reason why I feel this medication
is inappropriate for this inmate[.]

(Crist M-Track 000314.)

24.     Following Dr. Tubbs' decision to discontinue Plaintiff's Ultram, Plaintiff sought

and obtained additional medication from the pill-line that afternoon.  (Crist M-Track 000313;

Tubbs Decl. ¶ 22–26.)  When asked to return the Ultram he had improperly obtained from the

pill-line, Plaintiff admitted receiving the medication but claimed that some unidentified

individual had taken it.  (Crist M-Track 000313; Tubbs Decl. ¶ 25.)  Plaintiff states that it was

not clear from his encounter with Dr. Tubbs that his Ultram prescription was being discontinued

immediately so he went to the pill-line to find out and was allowed to take the pills.  (Crist Aff. ¶

17.)  This incident prompted an investigation by prison staff which resulted in Plaintiff being placed on probation.  (Morell Decl. ¶ 22.)

25.     After Dr. Tubbs discontinued Plaintiff's Ultram, Plaintiff immediately began seeking a second opinion.  When Plaintiff's initial requests were denied, Plaintiff wrote a letter to Dr. Richard Garden, Medical Director for the Utah Department of Corrections, requesting a review of his treatment.   Dr. Garden responded on March 2, 2009, stating that he had reviewed Plaintiff's records and determined that Dr. Tubbs' recommendations were appropriate.  (Doc. no. 64, Ex. M.)  Plaintiff also wrote to the Utah Attorney General's Office which in turn contacted Dr. Garden and requested another review of Plaintiff's treatment.  (Doc. no. 64, Ex. P, Letter dated March 4, 2009.)

26.     On March 10, 2009, Plaintiff was examined by Dr. Roberts, another doctor at the prison, for a second opinion.  Plaintiff states that during the examination Dr. Roberts said he had been contacted by Dr. Tubbs regarding concerns about Plaintiff.  (Crist Aff. ¶21.)  Dr. Roberts questioned Plaintiff about Dr. Tubbs' concerns.  (*Id*.)  Following the examination Dr. Roberts prescribed Darvocet for pain management and ordered additional follow up care including a cervical MRI.  (*Id*.)

27.     That same day Dr. Tubbs entered the following record in Plaintiff's M-Track file:

> Type: MD SICK CALL
> Start: 03/10/2009 17:06
> End: 03/10/2009 17:09
> Desc.: I have spoken to Dr. Roberts for a second opinion on this inmate pain managementn [sic].  Neurosurgery also has evaluated his MRI.  They reported that his MRI findings are not emergent and that he will be scheduled in July for an appointment as that is an

> appropriate time frame for evaluation with MRI findings consestant
> [sic] with this patient.  I have also read this inmates grievence [sic]
> and letters to Dr. Garden related to his pain management.  Though
> there is little truth to his letters it does show his abberrent [sic]
> behavior of seeking pain medications.  I spoke with the officers that
> told me over the last 2 ½ weeks that he has been off the Ultram he has
> been going to recreation and participating without evidence of
> discomfort or inability to walk, jump, or move.  I am concerned from
> the letter that Mr. Crist is seeking retaliation towards me for my
> decision to discontinue his medications . . . .

(Crist M-Track 000307.)

28.     The next day, on March 11, 2009, Dr. Tubbs conducted a pain management clinic

for approximately fifty inmates receiving pain medications at the prison.  During this clinic Dr.

Tubbs used some of Plaintiff's interactions and complaints as examples of potential drug-seeking

behavior but did not specifically identify Plaintiff by name.  (Tubbs Decl. ¶ 29.)  Other inmates

who attended the clinic later stated it was apparent Dr. Tubbs was referring to Plaintiff.  (Doc.

no. 64, Ex. T-1 and T-2.)  Plaintiff asserts that the clinic was intended to single Plaintiff out and

place him in jeopardy from other inmates.  (Crist Aff. ¶ 22.)  Dr. Tubbs states the purpose of the

clinic was to educate inmates and staff about how to deal with pain management, narcotics

addiction, and prisoner complaints.  (Tubbs Decl. ¶ 29.)

29.     Sometime in mid-March, 2009, Plaintiff filed a complaint against Dr. Tubbs with

the Utah Division of Occupational and Professional Licensing (DOPL) alleging that Dr. Tubbs

discontinued his medications in retaliation for pursuing legal action against several med-techs.

On March 25, 2009, DOPL Investigator Lloyd Hansen sent an email to Dr. Garden asking him to

look into Plaintiff's allegations.  (Doc. no. 63, Ex. 3.)  Dr. Garden responded that it was not clear

why Dr. Tubbs discontinued Plaintiff's medications on February 20, 2009, just three days after

continuing Plaintiff's medications and referring Plaintiff for specialty care.  (*Id*.)  Dr. Garden

speculated that Dr. Tubbs must have determined Plaintiff was drug seeking, but recommended

that Hansen contact Dr. Tubbs directly about the incident, which Hansen did.  (*Id*.)  Dr. Tubbs

responded by email to Mr. Hansen on March 29, 2009, explaining that his decision was based on

addiction concerns, not Plaintiff's threatened lawsuit.  Dr. Tubbs also stated that he had

discussed Plaintiff's treatment with Dr. Roberts, and they agreed that Plaintiff should receive

Darvocet which, unlike Ultram, is more readily monitored through routine urinalysis testing.

(*Id*., Tubbs Decl. ¶ 26, Crist M-Track 000307.)

      30.     On April 1, 2009, Plaintiff was examined by Dr. Tubbs for renewal of his

Darvocet prescription.  Plaintiff states that Dr. Tubbs accused Plaintiff of helping other inmates

file lawsuits against medical staff and threatened Plaintiff against doing so.  (Crist Aff. ¶ 25.)

Following the exam Dr. Tubbs reduced Plaintiff's Darvocet prescription by half.  Dr. Tubbs

noted in M-Track that the reduction was based on Plaintiff's complaints about side effects,

reported improvement in Plaintiff's pain, and Plaintiff's request to ultimately get off medications.

(Crist M-Track 000307; Tubbs Decl. ¶ 28.)  Plaintiff denies requesting a reduction in his

medication and asserts this was further retaliation by Dr. Tubbs.  (Crist Aff. ¶ 26.)

      31.     On April 28, 2009, P.A. Merrill recorded in M-Track that Plaintiff had requested

an increase in his pain medication and Merrill was concerned that Plaintiff was "doctor

shopping" among the prison medical staff with the intent to obtain additional pain medications.

(Crist M-Track 000287.)  Plaintiff denies that he even visited P.A. Merrill that day and states that

he was unable to attend the appointment because he was transferred to a different unit.  (Crist

Aff. ¶ 31 and Ex. FF.)

33.     On April 30, 2009, Dr. Tubbs entered a "Caution" in Plaintiff's O-Track records

stating that Plaintiff was not to receive any more narcotic medications based on alleged reports

from Sgt. Morell about Plaintiff selling medications at the Conquest drug treatment center.  (Doc.

no. 64, Ex. AA-2.) The caution incorrectly stated that Plaintiff was kicked out of the drug

treatment program for selling medications and that since Plaintiff's departure Sgt. Morell

reported a decrease in sales of medication on the unit.  (*Id.*)  Plaintiff filed a grievance stating

that this information was untrue and asking that the caution be removed.  (Casper Decl. ¶ 18.)  In

response to Plaintiff's grievance Billie Casper, the prison Grievance Coordinator, investigated

the origins and basis for the caution.    (*Id.* ¶ 26.)  Casper determined that, in fact, Plaintiff had

completed the Conquest program without incident.  Casper spoke with Dr. Tubbs and determined

that the caution resulted from a misunderstanding on Dr. Tubbs' part.  (Tubbs Decl. ¶ 32.)  Dr.

Tubbs states that his comments about Plaintiff resulted from "a mistaken overstatement of the

level of direct knowledge the officers had regarding Crist's misuse of narcotic pain medications

while in Promontory." (*Id.*)  Based on Casper's findings the caution was removed from the O-

Track system.  (Casper Decl. ¶ 26.)  To the extent the information remains, it is located only in

Plaintiff's confidential medical records, to which only medical staff have access.  (Tubbs Decl. ¶

32.)

33.     In June, 2009, Plaintiff underwent an MRI at the University of Utah Hospital

which showed no indication for surgery and that the disc issues found at L5-S1 were clinically

14

insignificant.  The report recommended pain medications as needed from Plaintiff's primary provider.  (Crist M-Track 000260.)

34.     In July, 2009, Plaintiff again requested to be placed back on pain medications and also to be seen regarding back injections.  (Crist M-Track 000254.)

35.     In August, 2009, Plaintiff was seen for continued lower back pain and additional physical therapy was ordered.  (Crist M-Track 000245-000246.)

36.     Dr. Tubbs and his staff were unaware of any formal legal proceedings initiated by Plaintiff throughout 2008 or 2009.  Dr. Tubbs continued to treat Plaintiff, even though Plaintiff threatened to "cause problems" for Dr. Tubbs and his staff and to have Dr. Tubbs' license revoked.  (Crist M-Track 000276–77.)

37.     In September 2009, Plaintiff reported an unwitnessed slip and fall resulting in worsening back pain.  Plaintiff was prescribed Cyclobenzaprine (flexeril), a muscle relaxant to help with the muscle spasms and was referred to a physician for back injections and physical therapy.  (Crist M-Track 000217-000218.)

38.     In 2010–11, Plaintiff underwent additional MRIs at the University of Utah medical center.  The results showed a "L5-S1 with a broad based disc protrusion."  (Crist M-Track 000151-00152, 000007.)

39.     Since Plaintiff's MRI on September 29, 2010, he has been continually prescribed and provided Tramadol.  Plaintiff's later physicians elected to prescribe Tramadol instead of Darvocet because Darvocet's effectiveness was questioned and it was ultimately removed from the market for pain management.  (Crist M-Track 000001-000149; Tubbs Decl. ¶ 33.)

***Plaintiff's Second Encounter with Sgt. Olin.***

40.     After the July 18, 2008, incident in which Sgt. Olin assisted Med-Tech Shuman in removing Plaintiff from the pill-line, Sgt. Olin next encountered Plaintiff on August 26, 2008. On that day he was assigned as the North Point Transportation Officer and, as part of his duties, was required to transport inmates housed at Promontory Point to the prison infirmary.  Plaintiff was on the schedule to be transported.  (Olin Decl. ¶ 19–22.)  Sgt. Olin did not elect to enter Promontory Point or seek out Plaintiff, but rather, was required to do so as part of his assigned duties.  (*Id.*)

41.     After entering the facility and noting that Plaintiff was on the list, Olin asked the staff on duty if they knew about the July 18, 2008, pill-line incident with Plaintiff.  Olin recounted the situation describing Plaintiff with the word "pussy."  (*Id.* ¶¶ 22-26.)  Plaintiff states that Olin also told another officer, "Have Crist ready by one o'clock for transport, and put a fuckin' muzzle on him would you?"  (Crist Aff. ¶ 9.)  When the officer asked why, Olin reportedly said, "Because the pussy put a grievance in on me, take care of that would you!"  (*Id.*)

42.     Another inmate relayed part of this conversation to Plaintiff and he refused to be transported by Olin.  (*Id.* ¶¶ 29–33; Am. Compl. ¶ 22.)  Plaintiff states that he initially requested a different transport but was denied; he then refused to be transported by Olin out of fear for his safety.  (Crist Aff. ¶ 9.)  Olin then reportedly explained that Plaintiff would not be alone with him and there was no reason to be afraid; nevertheless, Plaintiff still refused transport.  (Olin Decl. ¶ 31–33.)  Plaintiff states that this caused him to miss a scheduled physical therapy appointment. (Crist Aff. ¶ 9.)

### IV.  Cruel and Unusual Punishment

Plaintiff alleges separate counts of cruel and unusual punishment under the Eighth Amendment against each of the following defendants: Dr. Tubbs (Count II), Sgt. Morell (Count III), Sgt. Olin (Count IV), Med-Tech Best (Count V), Med-Tech Shuman (Count VI), and Med-Tech Fannen (Count VII).  After laying out the relevant legal standard the Court will address each of these claims in turn.

### A.  Legal Standard for Denial of Medical Care Claims

In *Estelle v. Gamble*, 429 U.S. 97, 97 S. Ct. 285 (1976), the Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment."  *Estelle*, 429 U.S. at 104 (quoting *Greg v. Georgia*, 428 U.S. 153, 96 S. Ct. 2909 (1976)).  "Deliberate indifference involves both an objective and a subjective component."  *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000).  The objective component is met if the deprivation is "sufficiently serious."  *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970 (1994).  A medical need is sufficiently serious "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999).

The subjective component is met only if a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837.  Allegations of mere negligence in diagnosing or treating a

17

medical condition, *Estelle*, 429 U.S. at 105, or "inadvertent failure to provide adequate medical care," *Riddle v. Mondragon*, 83 F.3d 1197, 1203 (10th Cir. 1996), are insufficient to state a claim under the Eighth Amendment.  "Delay in [providing] medical care only constitutes an Eighth Amendment violation where the plaintiff can show that the delay resulted in substantial harm."  *Sealock*, 218 F.3d at 1210.  The Tenth Circuit has held that the "substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Garrett v. Stratman*, 254 F.3d 949, 950 (10th Cir. 2001).

## B.  Evidentiary Sufficiency

### i.  Dr. Kennon Tubbs

Objective Component: Serious Medical Need

This case raises unique challenges in evaluating the objective seriousness of Plaintiff's medical needs.  On the one hand, if Plaintiff's reports of nearly constant, excruciating pain are believed, there is little question that such pain would be sufficiently serious to satisfy the objective component under *Farmer*.  On the other hand, the crux of Defendants' arguments is that Plaintiff was not truly experiencing severe pain, but was merely exaggerating his symptoms in order to obtain drugs, making his medical needs objectively insufficient to invoke constitutional protection.  Given the subjective nature of pain it is practically impossible to present incontrovertible proof of it.  However, in this case there is some objective evidence regarding the nature of Plaintiff's injury and the degree of pain he experienced.

Defendants argue that prior to Plaintiff's unwitnessed slip and fall in September of 2009, and the MRI results obtained thereafter, there was no objective medical evidence showing that

18

Plaintiff suffered from a serious back injury which required prescription pain medication.  This assertion is not supported by the record.  In fact, Plaintiff's medical records show that medical personnel, including Dr. Tubbs himself, noted some abnormalities on Plaintiff's original MRI from November 2008.  This is confirmed by the fact that Plaintiff was allowed to remain on Ultram following that MRI, despite Dr. Tubbs hesitancy to continue the medication without objective evidence of injury.  Although Defendants later began to question the seriousness of Plaintiff's injury and the necessity for medication, especially in light of the addiction risk, it is undisputed that the medication was initially prescribed based on credible complaints of back pain and that it was continued based on objective test results.  Moreover, at the time Dr. Tubbs discontinued the medication, Plaintiff was still reporting the same symptoms which caused the medication to be prescribed in the first place, only worse.  These are all objective indicators that Plaintiff suffered from a serious medical condition which warranted treatment.

Thus, despite the conflicting evidence, based on a review of the entire record and viewing the evidence in the light most favorable to Plaintiff, the Court concludes that Plaintiff has presented sufficient evidence from which a jury could conclude that starting in late-March 2008, Plaintiff suffered from a back injury that was sufficiently serious to warrant Eighth Amendment protection.[4]  Thus, the Court must now turn to the question whether Defendants were deliberately indifferent to Plaintiff's need for medical treatment.

---

[4] Although it is well-recognized that de minimis injuries do not warrant constitutional protection, Defendants have never argued that Plaintiff's injury was merely de minimis.

<u>Subjective Component: Deliberate Indifference</u>

The bulk of Plaintiff's evidence of deliberate indifference stems from the actions of Dr. Tubbs.  Most importantly, Plaintiff asserts that the timing, circumstances and abruptness of Dr. Tubbs' decision to discontinue Plaintiff's Ultram prescription show that it was not based on legitimate medical concerns but was intended merely to harm Plaintiff in retaliation for his stated plans to sue medical personnel.  Plaintiff asserts that Dr. Tubbs' subsequent actions of investigating Plaintiff's drug history and documenting addiction concerns were intended merely to obscure Tubbs' true motive.  Plaintiff further asserts that Dr. Tubbs' singling Plaintiff out during the hastily arranged "pain management seminar" and his logging of a "caution" against Plaintiff based on incorrect information, show a campaign of harassment and intimidation toward Plaintiff.  While Plaintiff has mustered some support for these arguments, the overwhelming weight of the evidence shows that Dr. Tubbs was merely fulfilling his professional duties and was legitimately concerned for Plaintiff's well-being.  The Court finds that, even accepting Plaintiff's evidence as mustered, no reasonable jury could render a verdict for Plaintiff.

Dr. Tubbs has demonstrated that as a supervising physician he had a duty under the Utah Controlled Substances Act to ensure that prison medical staff did not enable inmates to abuse controlled substances or other drugs.  (Tubbs Decl. ¶ 6.)  As one of the senior physicians at the prison Dr. Tubbs undoubtedly took this obligation seriously.  Moreover, early in Plaintiff's treatment Dr. Tubbs noted in M-Track his concerns that Plaintiff was a former drug user who might be malingering in order to feed an addiction.  Thus, at the very least, based on his limited knowledge of Plaintiff's history, Dr. Tubbs had reason to be concerned that Plaintiff was highly

20

susceptible to becoming addicted to narcotic medications.  The fact that Dr. Tubbs noted these concerns well before Plaintiff reported experiencing any friction with him strongly supports the conclusion that Dr. Tubbs' decision to terminate Plaintiff's medication was well-intentioned.[5]

While the timing and circumstances surrounding Dr. Tubbs' decision to discontinue Plaintiff's medication appear somewhat unusual, they do not show that Dr. Tubbs was deliberately indifferent to Plaintiff's needs.  Although Plaintiff has presented evidence that Dr. Tubbs' decision to terminate Plaintiff's medication was abrupt and extraordinary, the overall circumstances support the conclusion that Dr. Tubbs simply reached a tipping point in his concerns about addiction, not that he intended to retaliate for any threatened lawsuit.  While there is some dispute regarding exactly what happened during the encounter on February 20, 2008, and exactly how it came about, the undisputed facts show that the encounter gave Dr. Tubbs substantial basis to conclude that Plaintiff had crossed the line into drug seeking behavior and that the therapeutic benefits of the medication no longer outweighed the risk of addiction. Plaintiff does not deny that the encounter was somewhat heated, in fact, he admits that he argued back and forth with Dr. Tubbs and expressed his frustration at being treated like a "drug addict." Moreover, Plaintiff admits that he initiated the encounter, despite the fact that he had previously seen Dr. Tubbs just several days prior.  While Plaintiff offers a seemingly benign explanation for approaching Dr. Tubbs so soon after his previous visit, the suddenness of Plaintiff's return,

---

[5]  Plaintiff asserts that Dr. Tubbs had no knowledge of Plaintiff past drug history prior to the incident on February 20, 2009.  (Doc. no 94 at 20 ¶ 5.)  In fact, Dr. Tubbs had noted Plaintiff's history of drug abuse as early as October 10, 2008.  (Crist M-Track 000371-72.)

coupled with Plaintiff's threat to file a lawsuit, could reasonably have been interpreted by Dr. Tubbs as a red flag that Plaintiff was seeking additional medication for illicit purposes and needed to be withdrawn immediately.  As such, Dr. Tubbs' subsequent actions of further researching and documenting Plaintiff's drug abuse history and conducting a pain management seminar for other inmates and staff do not show indifference but, rather, heightened concern about abuse.

Plaintiff argues that the second opinion he received from Dr. Roberts also shows that Dr. Tubbs was deliberately indifferent.  However, the fact that Dr. Roberts, in consultation with Dr. Tubbs, decided to place Plaintiff on Darvocet just weeks after the Ultram was discontinued does not undermine Dr. Tubbs' decision.  Dr. Tubbs did not conclude that Plaintiff no longer had a medical condition requiring treatment, instead, he merely determined that given the limited objective evidence supporting Plaintiff's back injury and the increasing signs of drug-seeking behavior the risks of continuing to prescribe Ultram outweighed the benefits.  This is clearly a valid medical judgment which is entitled to deference.  Moreover, Dr. Tubbs' subsequent consent to prescribing Darvocet–based on the fact that it could be more easily detected through urinalysis testing–further supports the conclusion that Dr. Tubbs' was not indifferent to Plaintiff's needs but, rather, was legitimately concerned about abuse.  The fact that Plaintiff received the second opinion and Darvocet prescription only after contacting the AG's Office and DOPL does not undermine this conclusion, as Dr. Tubbs was not required to second guess himself.  In addition, the interlude may have helped establish a baseline for reevaluating Plaintiff's pain.  And Plaintiff's subsequent actions may also have provided additional objective grounds for resuming

22

medication.  Thus, Dr. Roberts' decision to prescribe Darvocet just weeks after Dr. Tubbs discontinued the Ultram does not show that Dr. Tubbs was deliberately indifferent, rather, it merely shows a more nuanced approach to balancing the need for medication against the risk of abuse.

In sum, the record here does not support the conclusion that Dr. Tubbs was deliberately indifferent to Plaintiff's medical needs by discontinuing Plaintiff's Ultram prescription.  Instead, the evidence merely shows a difference of opinion regarding the risks and benefits of continuing the medication and the proper treatment for Plaintiff given his medical history.  Even assuming that Dr. Tubbs was wrong about Plaintiff's level of dependence and misgauged the extent to which Plaintiff was showing drug-seeking behavior, there is no question that Dr. Tubbs had valid objective grounds for his decision.  Thus, the Court concludes that Plaintiff has not met his burden of showing that Dr. Tubbs was deliberately indifferent to Plaintiff's needs in violation of the Eighth Amendment.

### ii.  Sergeant Morell

Plaintiff's evidence is also insufficient to show cruel and unusual punishment by Sergeant Morell.  Plaintiff's only allegation against Sergeant Morell is that he "created fraudulent documentation . . . by claiming that Crist was caught selling drugs" in the Conquest program, which contributed to the decision to stop Plaintiff's medication in April of 2009.  (Am. Comp. at 12, ¶ C.)  This allegation is clearly insufficient to state an Eighth Amendment claim.  First, there is no evidence that Sgt. Morell had any knowledge regarding Plaintiff's injury or medical needs, thus he could not have been indifferent to them.  Second, Sgt. Morell was not in a position to

prescribe or withdraw medication from Plaintiff and, therefore, he could not have inflicted wanton and unnecessary pain on Plaintiff by denying him medication.  Finally, there is no evidence that Sgt. Morell intended to harm Plaintiff or to influence his medical treatment by passing along information to Dr. Tubbs.  In fact, it appears that Sgt. Morell did not initiate the contact but merely responded to Dr. Tubbs inquiries.  And, most importantly, it appears that the decision to discontinue Plaintiff's medication resulted from Dr. Tubbs' misunderstanding of the information provided by Sgt. Morell.  Thus, Sgt. Morell is entitled to summary judgment on Plaintiff's Eighth Amendment claim.

### iii.  Sergeant Olin

Plaintiff alleges cruel and unusual punishment against Sgt. Olin based on his involvement in the pill-line incident on July 18, 2008, and on Olin's alleged "threats" when subsequently tasked with transporting Plaintiff to a medical appointment.  Regarding the pill-line incident, Plaintiff does not allege that Sgt. Olin used excessive force or prevented Plaintiff from receiving his medication; instead, Plaintiff merely alleges that Sgt. Olin entered a negative C-Note in Plaintiff's O-Track file regarding the incident.  This allegation hardly supports a claim for cruel an unusual punishment.  In fact, Plaintiff does not deny that Sgt. Olin had ample reason to believe Plaintiff was acting disorderly at the pill-line and Plaintiff admits that he received the least severe punishment available under prison guidelines.  Thus, this allegation clearly fails to state a claim under the Eighth Amendment.

Regarding the transportation incident, Plaintiff has not presented evidence showing that he was directly threatened or given cause to legitimately fear for his safety.  Plaintiff's assertion

that Sgt. Olin voluntarily came to Plaintiff's housing unit to threaten and possibly attack him is not supported by the evidence.  In fact, the record shows that Sgt. Olin went to Plaintiff's unit as part of his assigned transportation duties.  Moreover, it is well-established that mere verbal harassment does not violate the Eighth Amendment.  *Collins v. Cundy*, 603 F.2d 825, 827 (10th Cir. 1979).  While Sgt. Olin's alleged statements may have been vulgar and unnecessary, they cannot reasonably be viewed as anything more than idle banter.  It is highly unlikely that if Sgt. Olin actually intended to harm Plaintiff he would have openly announced his intention in front of numerous guards and prisoners.

Finally, Plaintiff has not shown that he was deprived of urgent medical care as a result of Sgt. Olin's statements.  Plaintiff alleges that he was scheduled for a physical therapy session which he refused to attend after being threatened by Sgt. Olin.  However, even accepting Plaintiff's assertion that he refused transportation out of fear for his safety there is no evidence that Plaintiff suffered any significant injury as a result.  Thus, Sgt. Olin is entitled to summary judgment on Plaintiff's Eighth Amendment claims.

### iv.  Med-Techs Best, Shuman & Fannen

Plaintiff alleges that the Med-Techs subjected him to cruel and unusual punishment by "violat[ing their] gatekeeper duty . . . [in] failing to report Crist's injury and extreme pain to a qualified person for diagnosis."  (Second Am. Compl. at 13-14 ¶¶ E-G.)  Plaintiff's only factual basis for this claim is his statement that he told the Med-Techs about his back injury and need for treatment on several occasions at the pill-line but they refused to provide treatment or make an emergency medical referral for him.

25

Defendants have presented ample evidence showing that med-techs are not authorized to perform assessments or make doctor referrals except when faced with emergency situations requiring immediate attention.  Nor are med-techs responsible for scheduling routine medical appointments, which must be made by submitting a medical request form.  Thus, the Med-Techs were not deliberately indifferent unless they failed to respond to a truly emergent situation which required immediate care.

Plaintiff has not shown that prior to his medical visit on July 23, 2008, Defendants Best, Shuman or Fannen were subjectively aware Plaintiff suffered from a serious medical condition requiring treatment.  As stated, a "serious" medical need is one that has already been diagnosed by a physician or is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Sealock*, 218 F.3d at 1209.  Plaintiff has not presented any evidence showing that the Med-Techs were aware Plaintiff's  back injury was emergent.  In fact, the record shows that Plaintiff walked to the pill-line each day and did not show signs of being immobilized or in excruciating pain.  Under these circumstances the Med-Techs were not deliberately indifferent by requiring Plaintiff to follow standard procedures for obtaining a doctor visit.  *See, e.g., Gonzalez v. Chudy*, No. C 10-3732 CW (PR), 2001 WL 4047577, at *4 (N.D. Cal. Sept. 9, 2011) (unpub.) (holding no deliberate indifference where prisoner required to complete medical request form before being seen by doctor absent medical emergency).  Moreover, there is no evidence that the Med-Techs were in any way responsible for the delay between Plaintiff's formal request for medical attention and his doctor visit, or that the delay caused substantial harm.  Thus,

Defendants Best, Shuman and Fannen are entitled to summary judgment on Plaintiff's Eighth Amendment claims.

## V.  First Amendment Retaliation Claims

Plaintiff alleges that Defendants violated his First Amendment rights by retaliating against him for filing grievances and pursuing legal action against medical personnel.  Plaintiff alleges separate retaliation claims against Dr. Tubbs (Count II), Sgt. Morell and Dr. Tubbs (Count III), and Sgt. Olin (Count IV).

### A.  Legal Standard

The Tenth Circuit has held that "[p]rison officials may not retaliate against or harass an inmate because of the inmate's exercise of his constitutional rights," *Fogle v. Pierson*, 435 F.3d 1252, 1263-64 (10th Cir. 2006), it has also noted that "[s]everal circuits have held that a prisoner's first amendment right to petition the government for redress of grievances encompasses the filing of inmate administrative appeals," *id*. at 1264.  However, to avoid summary judgment on such a retaliation claim, a plaintiff must produce facts showing: "(1) he was engaged in constitutionally protected activity, (2) the government's actions caused him injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the government's actions were substantially motivated as a response to his constitutionally protected conduct."  *Howards v. McLaughlin*, 634 F.3d 1131, 1144 (10th Cir. 2011) (quoting *Nielander v. Bd. of Cnty. Comm'rs*, 582 F.3d 1155, 1165 (10th Cir. 2009))(further citations and quotations omitted).

Under this standard the plaintiff bears the burden of proving that he was engaging in constitutionally protected activity.  A plaintiff cannot satisfy the first element if his alleged protest was frivolous or if he had no right to engage in the alleged activity.  *See, e.g., Lewis v. Casey*, 518 U.S. 343, 352–53 (1996) (holding prisoners' constitutional right to access courts not violated if claim interfered with was frivolous).  Regarding the second element, it is not sufficient that the plaintiff prove that he would be chilled by the conduct; instead, the test is objective: Would a person of "ordinary firmness" be chilled.  This test also depends upon the type of "person" involved—a citizen, employee, or prisoner.  *See Hemphill v. New York*, 380 F.3d 680, 688 (2d Cir. 2004) (noting test encompasses "similarly situated" person of ordinary firmness); *Lewis v. Jacks*, 486 F.3d 1025, 1028 (8th Cir. 2007) (articulating test as "inmate of ordinary firmness"); *Perkins v. Clayton Twp.*, No. 2:08-CV-14033, 2009 WL 3498815 (E.D. Mich. Oct. 23, 2009) (unpub.) ("[P]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens before an action taken against them is considered adverse." (citations and quotations omitted)).  Finally, a plaintiff must prove but-for causation—that the retaliatory purpose is the "decisive factor" in the adverse action.  *Strope v. McKune*, No. 09-3283, 382 F. App'x 705, 2010 WL 23332079 (10th Cir. June 11, 2010) (unpub.).  The plaintiff bears the burden of proving causation.  *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998).

## B. Evidentiary Sufficiency

### i. Dr. Tubbs

Plaintiff's primary allegations of retaliation against Dr. Tubbs stem from the discontinuance of Plaintiff's Ultram prescription and Dr. Tubbs' use of Plaintiff's case as an example during the pain management seminar.  Plaintiff alleges that these actions were retaliation for Plaintiff's filing of grievances regarding his medical care and for his stated intention to file a lawsuit against several med-techs at the prison.  Defendants do not dispute that these actions were constitutionally protected activities.  Thus, the primary questions here are whether Dr. Tubbs' actions caused Plaintiff injury which would have had a chilling effect on an inmate of ordinary firmness; and, whether Dr. Tubbs' actions were substantially motivated by Plaintiff's exercise of constitutionally protected rights.

There is little evidence here to support the conclusion that Dr. Tubbs' actions caused Plaintiff any injury which would have a chilling effect on an inmate of ordinary firmness.  As an initial matter, it is not clear that Plaintiff was injured at all by the discontinuation of his medication, which was actually intended for Plaintiff's benefit.  However, even accepting that Plaintiff was injured, Plaintiff offers little support for his contention that the threat of discontinuing a prisoner's medication would be likely to prevent an ordinary prisoner from filing grievances or lawsuits asserting inadequate medical care.  This contention is certainly contrary to the Court's own experience.  More importantly, Plaintiff's own evidence, in the form of affidavits from other inmates, also supports this conclusion.  Plaintiff was able to persuade at least two other inmates who were present at the pain medication seminar–and, thus, were

29

presumably receiving pain medications at the time–to submit affidavits supporting his case. Apparently they were not highly concerned that their involvement would result in their medications being discontinued.

Dr. Tubbs' conduct of the pain management seminar also does not appear to have had a significant chilling effect on Plaintiff or other inmates. Instead, the record shows that following the seminar Plaintiff continued to complain to a number of people, including the Utah Attorney General's Office and DOPL, about Dr. Tubbs' actions and enlisted other inmates to support his claims. Thus, Plaintiff has not shown that Dr. Tubbs' actions were likely to have a significant chilling effect on an inmate of ordinary firmness.

Plaintiff also fails to present evidence showing that Dr. Tubbs' decision to discontinue Plaintiff's medication, or to use Plaintiff's case as an example during the pain medication seminar, were substantially motivated by Plaintiff's filing of grievances or threatening legal action. As an initial matter, Plaintiff has not refuted Dr. Tubbs' assertion that he had no actual knowledge of Plaintiff's lawsuits and grievances at the time he discontinued Plaintiff's medication. (Tubbs Decl. ¶¶ 19, 30.) Moreover, the evidence shows that Dr. Tubbs' actions were motivated by valid concerns about drug addiction and abuse. As previously discussed, when he discontinued Plaintiff's medication Dr. Tubbs had ample reason to believe that Plaintiff was exhibiting signs of addiction. In addition, the evidence strongly supports Dr. Tubbs' assertion that the pain management seminar was intended to educate inmates and staff about addiction issues and provide guidance on handling drug-seeking behavior, not to harm Plaintiff or dissuade him from filing grievances or lawsuits. Finally, even after Plaintiff filed his

grievances Dr. Tubbs did not stop treating Plaintiff; instead, he continued to care for Plaintiff and even worked with Dr. Roberts to find an alternative medication which would meet Plaintiff's needs while addressing Dr. Tubbs' addiction concerns.

Thus, the Court concludes that Dr. Tubbs is entitled to summary judgment on Plaintiff's retaliation claim.

### ii.  Count III: Sergeant Morell and Dr. Tubbs

Plaintiff alleges that Sgt. Morell and Dr. Tubbs conspired to retaliate against Plaintiff by making false accusations regarding Plaintiff's use or sale of drugs while in the Conquest program and entering a "caution" in Plaintiff's prison records.  Once again, Defendants do not deny that Plaintiff's filing of grievances was a protected activity, but they assert that Plaintiff was not injured by the accusations or the caution.  Defendants also deny their actions were substantially motivated as a response to Plaintiff's exercise of protected conduct.

Plaintiff has not shown that he suffered any cognizable injury as a result of the accusations or caution.  First, the information was not widely disseminated and was recorded only in prison records which are typically only available to corrections personnel.  They are not available to the public or to other inmates.  Second, Plaintiff admits that the caution was removed from O-Track in response to his grievances and that it remains only in M-Track, the confidential medical record which is only available to medical personnel.  And, third, there is no evidence that such accusations or reports would have a chilling effect on the protected conduct of an inmate of ordinary firmness.  In fact, inmates routinely file grievances and lawsuits challenging such administrative action.

31

Finally, there is no evidence that Sgt. Morell's alleged accusations or Dr. Tubbs' entry of the caution were substantially motivated as a response to Plaintiff's constitutionally protected conduct. The record shows that in April 2009, in response to Plaintiff's continuing requests for increased pain medication and incidents of perceived doctor-shopping, Dr. Tubbs inquired about Plaintiff's performance while in the Conquest program. From a conversation with Sgt. Morell, Dr. Tubbs drew the mistaken conclusion that Plaintiff was kicked out of the program after being caught selling medications. In fact, Plaintiff was never caught selling drugs and actually completed the program. While the reasons for Dr. Tubbs' confusion are unclear, there is no evidence that his actions were retaliatory or malicious. Instead, they appear to have merely been part of Dr. Tubbs' ongoing effort to monitor Plaintiff's care and protect against addiction and abuse.

Thus, Sgt. Morell and Dr. Tubbs are entitled to summary judgment on this claim.

### iii.  Sgt. Olin

Plaintiff's claim of retaliation against Sgt. Olin stems from the pill-line incident on July 18, 2008, and the medical transportation incident on August 26, 2008. Plaintiff asserts that the threats and derogatory statements Sgt. Olin allegedly made during the transportation incident were retaliation for Plaintiff's filing of a grievance against Olin regarding the pill-line incident. Even accepting this assertion, Plaintiff has not presented evidence showing that Sgt. Olin's actions would chill an inmate of ordinary firmness from continuing to file grievances or pursue legal action. In fact, the record shows that Sgt. Olin's statements–asking a guard to put a "muzzle" on Plaintiff and calling him a derogatory name–were not truly threatening. Plaintiff's

assertion that he genuinely feared for his safety based on second-hand accounts of these statements are not believable.  More importantly, Plaintiff's apparent hypersensitivity to Sgt. Olin's statements is irrelevant given the objective standard applicable to retaliation claims.  Thus, Sgt. Olin is entitled to summary judgment on Plaintiff's retaliation claim.

### VI.  Supplemental State Law Claims

Under 28 U.S.C. § 1367(c)(3) a district court may decline to exercise supplemental jurisdiction over state law claims if it has dismissed all claims over which it has original jurisdiction.  Having concluded that Defendants are entitled to summary judgment on Plaintiffs' federal constitutional claims the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims.  Thus, Plaintiff's state law claims are dismissed without prejudice.

### ORDER

Based on the forgoing analysis, **IT IS HEREBY ORDERED** that:

(1) Defendants' Motion for Summary Judgment (Doc. no. 84) is **GRANTED**;

(2) Plaintiff's state law claims are **DISMISSED** without prejudice under 28 U.S.C. § 1367(c)(3); and,

(3) this case is **CLOSED**.

DATED this 10th day of September, 2012.

BY THE COURT:

_____
TED STEWART, Chief Judge
United States District Court

33